Frank S. Hedin (SBN 291289)
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinllp.com

Adrian Gucovschi (State Bar No. 360988)
**GUCOVSCHI LAW FIRM, PLLC**
165 Broadway, 23rd Floor
New York, New York 10006
Telephone: (212) 884-4230
E-Mail: adrian@gucovschilaw.com

*Counsel for Plaintiff and Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE GUIDOTTI, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-10916-SK |
| Plaintiff, | |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| KRADLE LLC, | |
| Defendant. | (DEMAND FOR JURY TRIAL) |

Plaintiff Nicole Guidotti brings this action on behalf of herself and all others similarly situated against Defendant Kradle, LLC.   Plaintiff makes the following allegations pursuant to the investigation of her counsel and upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## INTRODUCTION

1.     This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme.

2.     Defendant sells a wide range of pet food through various online channels, including on its website, www.kradlemypet.com (the "Website"), and in advertisements on social-media sites, including Instagram. Whenever a consumer purchases Defendant's products – whether it be on the Website or through a social-media advertisement – Defendant surreptitiously enrolls the consumer in an automatically renewing "subscription" that, unbeknownst to the consumer at the time, results in a recurring charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method") every month, in perpetuity until canceled (the "Kradle Subscriptions").

3.     Prior to enrolling Plaintiff and its other customers into Kradle Subscriptions – and thereafter assessing each of their Payment Methods a recurring charge on a monthly basis – Defendant failed to provide the disclosures and authorizations required by California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq.*, to any of these consumers.

4.     Pursuant to the ARL, online retailers that offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5.     As discussed in greater detail below, the electronic "checkout flows" on Defendant's Website and social-media advertisements, which Plaintiff and numerous other California consumers

used to purchase Defendant's products, uniformly violated each of these core requirements of the ARL. And when consumers eventually do realize that Defendant has enrolled them in Kradle Subscriptions without their authorization – such as when consumers notice Defendant's recurring charges on their credit card billing statements – Defendant then makes it exceedingly difficult and unnecessarily confusing for consumers to cancel the Kradle Subscriptions.

6. Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3). *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id.* § 17601(b)(1)-(5) (setting forth the definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)). The standardized post-order acknowledgment email sends to its customers also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation – making it exceedingly difficult and unnecessarily confusing for consumers to cancel Kradle Subscriptions – in clear violation of Section 17602(c) of the ARL.

7. As a result of Defendant's violations of Section 17602 of the ARL, the Kradle Subscriptions are deemed "unconditional gifts" pursuant to Section 17603 of the ARL, entitling Plaintiff and the Class to restitution. *See* Cal. Bus. & Prof. Code § 17603.

8. For the foregoing reasons, Plaintiff brings this action individually and on behalf of all subscribers of any of Defendant's Kradle Subscriptions who, within the applicable statute of limitations period up to and including the date of judgment in this action, were induced by Defendant's false sales or incurred unauthorized fees for the renewal of their Kradle Subscriptions. Based on Defendant's unlawful conduct, Plaintiff seek damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (1) violation of California's False

Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (2) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (4) negligent misrepresentation; (5) intentional misrepresentation; and (6) unjust enrichment/restitution.

## THE PARTIES

9.      Plaintiff Nicole Guidotti is, and at all times relevant hereto was, a citizen and resident of Berkeley, California.

10.      The facts giving rise to Plaintiff's claims are materially the same as those of other members of the Class she seeks to represent

11.      Defendant Kradle, LLC is a Delaware corporation that maintains its corporate headquarters and principal place of business in Minneapolis, Minnesota. Defendant is an online-based retailer of pet food, which it sells to consumers on its Website and through social-media advertisements to consumers nationwide, including throughout California.

12.      Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a putative class action where the aggregate amount sought by members of the proposed class exceeds $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different from Defendant.

14.      Personal jurisdiction and venue are proper because Plaintiff resides in Berkeley, California, within this judicial District; because Plaintiff made her purchase of Defendant's products while she was physically present in Berkeley, California; because Defendant shipped such goods to Plaintiff's residence in Berkeley, California; and because Plaintiff was located in Berkeley,

California when Defendant enrolled her in, and thereafter charged her Payment Method on a monthly basis pursuant to the Kradle Subscription.  Additionally, Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in California, including within this judicial District, including through the promotion, marketing, and sale of its products.

**FACTUAL BACKGROUND**

**A.    Background On the Subscription-Based e-Commerce Industry**

15.    The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[1]  Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[2]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.5[3]  That constitutes an average annual

---

[1] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[2] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[3]    *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").

*See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[4]

16.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to *Forbes*, "[t]she subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[5]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[6]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[7]  Thus, "[t]she share prices of most subscription companies have performed well in recent years."[8]

17.    The expansion of the subscription e-commerce market shows no signs of slowing.  "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[9]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the

---

[4] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[5] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[6] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra*.

[7] *Id*.

[8] *Id*.

[9] *Id*.

pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[10]

18.      However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.[11]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[12]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[13]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[14]  As these companies have realized, "[t]she real money is in the inertia."[15]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[16]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies,

[10] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[11] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[12] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[13] *Id.*

[14] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[15] *Id.*

[16] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with the design and flow of their website and apps, *e.g.*, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic renewal programs.[17]

19.    To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[18] Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[19] For instance, numerous companies, including Defendant, have resorted to using "dark patterns" on their e-commerce platforms. A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[20] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[21] widespread utilization of misleading dark patterns and deliberate omissions persist.

---

[17]  TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[18] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra* ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[19] *Id.*

[20] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[21] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra.*

20.    Defendant successfully capitalized on this demand. In fact, Defendant's growth in revenue and subscriber count with respect to its Subscriptions coincides with a sharp decline in subscriber satisfaction as the Subscriptions and the platforms from which they operate have become riddled with "dark patterns."  Specifically, Defendant has used various types of dark patterns, including but not limited to "Roach Motel,"[22] "Misdirection,"[23] and "Forced Continuity," [24] in order to prevent users from canceling their Subscriptions by way of adopting complex cancellation procedures to increase the friction in the subscription cancellation process.  Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by consumers for paid Subscriptions, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.[25]

21.    As discussed below, Defendant has employed a host of dark patterns in its Website and social-media advertisements to lure and deceive millions of consumers into becoming and

---

[22] "Roach Motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[23] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"    https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[24] One example of "Forced Continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

[25] *See* Gizmodo, *Pervasive 'Dark Patterns' Are Fooling People Into Signing Up for Services They Don't Want* (Sep. 15, 2022), https://gizmodo.com/dark-patterns-ui-cancel-subscription-1849542166 ("As much as you think you have full control of you and your wallet, it's getting increasingly difficult for anybody using an app or a website to avoid getting suckered into surrendering your money or personal information to misleading or tricky UI design. … Tech companies and online retailers [] lure users into signing up for subscription services while obscuring costs or charges, then making it difficult to actually cancel.  Some dark patterns include confusing users in dense terms of service to obscure key limitations of products or junk fees attached to their use.")

remaining enrolled in Kradle Subscriptions. That is the precise conduct that California's legislature sought to prevent in enacting California's Automatic Renewal Law.

**B.    California's Automatic Renewal Law**

22.    In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).

23.    The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer.  If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.
>
> (2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.
>
> (3) Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

24.    The ARL also requires that, prior to the completion of the initial order for the automatic renewal or continuous service, sellers must explain the price to be charged when the

promotion or free trial ends. *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*. If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing. *See id*. Sellers must also notify consumers in the acknowledgment about how to cancel the free trial before they are charged. *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

25.    Section 17602(c) of the ARL further provides:

> A business that makes an automatic renewal offer or continuous service offer **shall provide a toll-free telephone number, electronic mail address**, a postal address if the seller directly bills the consumer, **or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation** that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c). (emphasis added).

26.    Additionally, the ARL also requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online. Specifically, Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service *exclusively online*, *at will*, *and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately*.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

27.    The ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

28.    Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

29.     Section 17601 of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any." Cal. Bus. & Prof. Code § 17601, *et seq.*

30.     The ARL defines "clear and conspicuous" or "clearly and conspicuously" meaning "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601.

31.     Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

32.     As alleged below, Defendant's practices on the Website and its social-media advertisements systematically violate Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

### C.     Defendant's Business: The Subscription Enrollment Process

33.     At all relevant times, Defendant offered, via the Website and through social-media advertisements (including on Instagram), nutritional supplements to consumers.

34.     When a consumer purchases a product from Defendant on its website or through one of its social-media advertisements, Defendant surreptitiously enrolls the consumer in a Kradle

Subscription that, unbeknownst to the consumer at the time, results in the consumer's Payment Method being assessed a recurring charge each and every month, in perpetuity (or until canceled by the consumer).

35.    Defendant's Kradle Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

36.    Regardless of whether a consumer purchases a product from Defendant on its website or through one of its social-media advertisements, the process of making the purchase – and becoming unknowingly enrolled in a Kradle Subscription – is substantially the same. Upon navigating the final screen of the checkout process (the "Checkout Page"), consumers are prompted to input their name, address, other contact information, and the details of their chosen Payment Method, and to finally click a giant payment buttons that obscure the other information on the webpage.

37.    Defendant's Checkout Page fails to comply with the ARL in numerous respects.

38.    Prior to enrolling Plaintiff and other Californians in Kradle Subscriptions, the ARL required Defendant to "present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer."  Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis added). Under the ARL, a "clear and conspicuous" disclosure "means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code §17601(3). The screenshots below are virtually identical in design and layout to what Plaintiff Guidotti encountered on the Website at the time of her enrollment. Defendant's Checkout Page fails these requirements in at least five independent respects, as depicted in the screenshots below.[26]

---

[26] The pictures are virtually identical to the webpages Plaintiff viewed at the time of her purchase.

### i.   The Default View Conceals All Subscription Terms

39.     When a consumer first arrives at Defendant's Checkout Page, the order summary is collapsed by default. In this default state, the page displays only a total dollar amount — for example, "$26.34" — alongside a prominent "Apple Pay" button and a standard checkout form soliciting the consumer's email address, delivery address, and payment method. The screenshot below depicts the Checkout Page as it appears upon arrival:



40.     In the default collapsed state, not a single element of the automatic renewal offer terms required by Cal. Bus. & Prof. Code § 17601(b) is visible on the page. No statement informs the consumer that the order is a subscription. No recurring charge amount is disclosed. No billing frequency is stated. No cancellation policy is referenced. The only subscription-related language anywhere on the page in this state is a single line in small, light-gray, non-contrasting font — identical in size and weight to the surrounding boilerplate text — stating: "By continuing with your

payment, you agree to the future charges listed on this page and the cancellation policy." This statement independently fails the ARL's disclosure requirement: it directs consumers to "charges listed on this page," but in the default collapsed state no such charges are listed anywhere on the page. A disclosure that points to information that does not exist on the page fails to present the required automatic renewal offer terms at all, let alone "clearly and conspicuously" as Cal. Bus. & Prof. Code § 17601(c) demands.

### ii.    *Even When Expanded, the Disclosure Fails the Clear and Conspicuous Standard*

41.    When a consumer manually expands the "Order summary" dropdown — an optional interaction that the Checkout Page does not prompt the consumer to take, and for which a consumer making a routine purchase has no obvious reason — the page displays the product name, size, and a line labeled "Delivery every 6 weeks." The expanded view is depicted below:



FIRST AMENDED CLASS ACTION COMPLAINT

42.    Defendant's disclosure fails the ARL's clear-and-conspicuous standard in the expanded view for multiple reasons. First, the phrase "Delivery every 6 weeks" describes a logistics interval, not a billing event. A reasonable consumer can interpret "Delivery every 6 weeks" as referring to a shipping schedule rather than an automatic recurring charge to her payment method. Second, the "Recurring subtotal" line and its associated dollar amount appear in the same font size, font weight, and gray color as every other line in the order summary — including the subtotal, shipping, and discount lines. It is not in larger type, contrasting type, contrasting font, or contrasting color, and it is not set off by symbols or marks as required under the statute. *See* Cal. Bus. & Prof. Code § 17601(c). Third, even if the "Recurring subtotal" line were conspicuous, it is not, the expanded order summary omits three required components of the "automatic renewal offer terms" as defined by Cal. Bus. & Prof. Code § 17601(b): that the subscription will continue until the consumer cancels, *id.* § 17601(b)(1); a description of the cancellation policy applicable to the offer, *id.* § 17601(b)(2); and the length of the automatic renewal term or that the service is continuous, *id.* § 17601(b)(4). Finally, because the order summary is collapsed by default, a consumer who proceeds through checkout without expanding the dropdown — which is the ordinary, expected path — never encounters any of this information at all.

### iii.    *The Only Substantive Explanation of Recurring Charges Appears Below the Payment Button — After, Not Before, the Point of Consent*

43.    After a consumer scrolls through the contact and delivery sections of the Checkout Page and reaches the payment section, the "Pay now" button appears as the prominent final action element — a full-width, green, boldly labeled button that is the most visually dominant element on the page. In the order summary area above the "Pay now" button, the "Recurring subtotal" line is visible — but, as discussed above, that line appears in the same gray, same-size, non-contrasting font as the other order-summary lines and therefore does not satisfy the ARL's clear-and-conspicuous standard. Directly below the "Pay now" button, in small, light-gray font materially smaller and less prominent than the surrounding text, appears a paragraph stating: "One or more items in your cart is a deferred, subscription, or recurring purchase. By continuing with your

payment, you agree that your payment method will automatically be charged at the price and frequency listed on this page until it ends or you cancel. All cancellations are subject to the cancellation policy." This layout is depicted below:



44.     This disclosure, too, is inadequate. ***First***, the paragraph appears below the "Pay now" button. The ARL requires that the automatic renewal offer terms be presented "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer." Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis added). The "request for consent" is the "Pay now" button — the act of clicking it is the consumer's completion of the subscription agreement. Defendant's disclosure, however, appears after that act, not before it. Critically, a consumer who clicks "Pay now" without first scrolling below the button — the natural behavior on a checkout page — never sees this language before her purchase is complete. ***Second***, the phrase "one or more items in your cart is a deferred, subscription, or recurring

purchase" does not clearly disclose that the consumer is enrolling in a subscription that will continue until she cancels. By offering three alternative characterizations — "deferred," "subscription," or "recurring purchase" — without specifying which applies, the disclosure fails to clearly communicate to the consumer that she is entering a subscription arrangement that will automatically renew on a defined billing cycle. A consumer reading this language could reasonably believe she is being charged a one-time future ("deferred") charge rather than an indefinitely recurring subscription. This vagueness fails to satisfy Cal. Bus. & Prof. Code § 17601(b)(1)'s requirement that the automatic renewal offer terms clearly disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels." ***Third***, the promise to charge "at the price and frequency listed on this page" is not a disclosure — it is a reference to a disclosure that the page itself fails to provide. As shown in the screenshot above, three different amounts are listed on the page in connection with recurring charges: (a) the "Recurring subtotal" of $26.34 every 6 weeks; (b) the "Recurring shipments" fee of $8.95 every 6 weeks; and (c) the "Total" of $35.29 for the first shipment. Because these figures are different, a consumer reading the phrase "the price . . . listed on this page" cannot determine whether her recurring charge will be $26.34 (the recurring subtotal), $35.29 (the sum of the product and recurring shipping charges), $35.29 (the first-order total), or some other amount. The disclosure does not clarify whether shipping is included in the recurring charge and does not state whether taxes will be added on each renewal. The net result is that the disclosure purports to identify the recurring charge by reference to the page, while the page itself contains irreconcilable figures from which the actual recurring amount cannot be determined. This fails § 17601(b)(3)'s requirement to disclose the specific recurring charges that will be assessed on each billing cycle. ***Fourth***, the statement that the consumer's Payment Method will be charged "until it ends or you cancel" fails to disclose that the subscription will continue until the consumer cancels. Cal. Bus. & Prof. Code § 17601(b)(1). The phrase "until it ends" implies the subscription may terminate on its own, without consumer action — the opposite of what § 17601(b)(1) requires the disclosure to communicate. A consumer reading this language could reasonably believe the subscription has a defined end date, reducing any urgency to cancel before renewal. ***Fifth***, the statement that "[a]ll cancellations are subject to the cancellation policy" discloses nothing about the

cancellation policy itself. It directs the consumer to an external policy without providing any description of the cancellation terms on the Checkout Page. This fails Cal. Bus. & Prof. Code § 17601(b)(2)'s requirement that the automatic renewal offer terms include "[t]he description of the cancellation policy that applies to the offer." In sum, Defendant's disclosure fails Cal. Bus. & Prof. Code § 17602(a)(1) on multiple independent and cumulative grounds: it appears after the consumer's consent action rather than before the subscription agreement is fulfilled; it uses vague tripartite language that fails to clearly identify the nature of the recurring charge; it references "the price and frequency listed on this page" while the page lists irreconcilable recurring figures whose sum is never disclosed; it implies the subscription may self-terminate; and it provides no description of the cancellation policy. Each deficiency constitutes an independent ARL violation.

### iv. The Upsell Mechanism Enrolls Consumers in a Second Subscription Without Any ARL Disclosure, and Promotional Items Make the Checkout Even More Confusing

45.    Defendant compounds its ARL violations by deploying a mid-checkout upsell that silently enrolls consumers in a separate, additional automatically renewing subscription. After a consumer has entered her payment information, Defendant displays a "Recommended for you" section containing a promoted product — for example, a second pet-supplement product priced at $29.74 — accompanied by a prominent full-width green button labeled "Subscribe and save up to 15%.: The upsell section is depicted below:



46.     Clicking the "Subscribe and save up to 15%" button immediately adds a second independently billed subscription to the consumer's cart. The upsell section provides no automatic renewal offer terms whatsoever for the added subscription. It does not state that the consumer's payment method will be charged automatically and repeatedly; it does not state the recurring charge amount; it does not state the billing frequency in any context other than a delivery interval; it does not describe the cancellation policy; and it does not provide any cancellation mechanism. In so doing, it violates the requirements set forth under the ARL. *See* Cal. Bus. & Prof. Code § § 17602(a)(1) and (2).

47.    The final rendition of the Checkout Page, with two subscriptions simultaneously enrolled, is depicted below:



48.    After the second product is added, the Checkout Page displays two simultaneously enrolled subscriptions operating on different billing frequencies. The only aggregated recurring-charge language is a single line which states: "This order has a recurring charge for multiple items." Again, the statement does not identify the amount of each recurring charge, the billing frequency for each subscription, when charges begin, or the cancellation rights applicable to each subscription independently. The Checkout Page becomes even more confusing when Defendant adds a promotional free item — in Plaintiff's case, a "CBD Skin Recovery Spray — 4 oz." with a strikethrough price of $12.99. The presence of a free item with a crossed-out price alongside two

FIRST AMENDED CLASS ACTION COMPLAINT

separately billed subscriptions at different frequencies creates a page on which three items are displayed with three different pricing treatments — a recurring charge at one frequency, a recurring charge at another frequency, and a free item — with no clear indication of which, if any, of these items or charges will recur in future billing cycles and on what schedule. A reasonable consumer in this circumstance has no meaningful way to determine from the Checkout Page alone what she will be charged, when, or how to stop any individual charge.

49.     In sum: Defendant failed to "first obtain[][any] consumer's affirmative consent to [any] agreement" with respect to the Kradle Subscription, let alone any such agreement "containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time." Cal. Bus. & Prof. Code § 17602(a)(2).

50.     Additionally, after enrolling a consumer in a Kradle Subscription, the ARL required Defendant to "provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer." Cal. Bus. & Prof. Code § 17602(a)(3).

51.     After Plaintiff and members of the Class placed orders on the Checkout Page, Defendant sent them each the same pro forma e-mail regarding their purchase (the "Acknowledgment Email").

52.     The post-order Acknowledgment Emails that Defendant systematically sent to its customers (including to Plaintiff and all proposed Class members) uniformly failed to include "the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer," as required by Cal. Bus. & Prof. Code § 17602(a)(3). Specifically, Defendant's Acknowledgment Emails failed to adequately disclose: that the Kradle Subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof. Code § 17601(b)(1); a statement of "[t]she recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, [and] if that is the case, and the amount to which the charge will change, Cal. Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term

or that the service is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code § 17601(b)(4).  As with the Checkout Page, disclosures of these required automatic renewal terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny fine print at the bottom of the Acknowledgement Email.  Further, the Acknowledgment Emails fail to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation of the Kradle Subscriptions, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel Kradle Subscriptions. Accordingly, each of the Acknowledgment Emails that Defendant sent to Plaintiff and Class members violated sections 17602(a)(3), 17602(b), and 17602(c) of the ARL.

53.    During the time period relevant to this action, the form and content of the Acknowledgment Email sent by Defendant to each member of the putative Class were the same, in all material respects, as the Acknowledgment Email that Defendant sent to Plaintiff.

54.    In sum, during the relevant time period, Defendant's deficient pre- and post-purchase disclosures to Plaintiff and Class members concerning the Kradle Subscriptions were totally non-compliant with the ARL.

55.    Because Defendant charged Plaintiff's and its other customers' Payment Methods in violation of the ARL, all goods, wares, merchandise, and/or products sent to Plaintiff and Class members upon the automatic renewal of their continuous service agreements are deemed to be "unconditional gifts" pursuant to Cal. Bus. & Prof. Code § 17603.

56.    As a direct result of Defendant's unlawful conduct described above, Plaintiff and putative Class members have incurred substantial financial injury in the form of all monies withdrawn from their Payment Methods in connection with the Kradle Subscriptions in which they were surreptitiously enrolled by Defendant.

57.    As set forth in further detail below, Plaintiff's claims, which are based on Defendant's failure to comply with the ARL constitutes "unlawful" conduct under the UCL.  Further, because the Kradle Subscriptions were, by operation of law, "unconditional gifts" to Plaintiff and putative Class members (*see* Cal. Bus. & Prof. Code § 17603) – and thus Plaintiff and Class members already

owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or contractual authority to do so – Plaintiff's claims are also based on Defendant's practice of charging consumers in exchange for unconditional gifts and arise under the "fraudulent" and "unfair" prongs of the UCL.  Additionally, Plaintiff brings this action against Defendant for violations of the CLRA and FAL, and conversion, unjust enrichment, negligent misrepresentation, and fraud.

### D.    Defendant misled Plaintiff regarding its automatic renewal subscriptions.

58.    On September 7, 2025, Plaintiff purchased Defendant's pet products through Defendant's Website. Her enrollment process was virtually identical, in design and layout, to the pictures depicting the Checkout Page and checkout process described above. *See supra* ¶¶ 41-49. When Plaintiff began her checkout, she intended to purchase a single item — one "CBD Sleepy CLEANZzz Dental Hard Chew — 6 Chews / Fresh Mint" — for a one-time charge of $26.34. She had no intent to enroll in any subscription or to authorize any recurring charge to her Payment Method.

59.    During checkout, while Plaintiff was filling in her contact and payment information, Defendant's Checkout Page presented her with a "Recommended for you" upsell module offering a second product ("CBD Skin Recovery Chews") for $29.74, alongside a prominently displayed full-width green button labeled "Subscribe and save up to 15%." A depiction of what Plaintiff saw, identical in design and layout, can be found *See supra* ¶ 45. The upsell module indicated that this second product would be available for "Delivery every 8 weeks" but did not state that clicking the button would enroll Plaintiff in a separately billed, automatically renewing subscription for that product. Believing she was adding the product to her current one-time order at a discounted price, Plaintiff clicked the "Subscribe and save up to 15%" button. Defendant also added a promotional free item — "CBD Skin Recovery Spray — 4 oz." — to Plaintiff's order, displayed with a strikethrough price of $12.99, indicating it was included at no charge based on a promotional offer. As a result, Plaintiff's checkout page displayed two separately billed subscriptions at different billing

frequencies alongside a free item with a crossed-out price, with no clear indication of which items would generate future recurring charges, at what amounts, on what schedules, or how each could be individually canceled. *See supra* ¶ 47.

60.    When Plaintiff signed up, she thought she was simply making a one-time purchase of pet products. Due to Defendant's misleading and incomplete ARL disclosures, Plaintiff Guidotti was unaware of the length, price, or cancellation policy associated with any subscription — let alone the fact that she was simultaneously enrolling in two separate, independently billed, automatically renewing subscription programs operating on different billing frequencies and requiring separate cancellation steps. Plaintiff did not, and could not, have given unambiguous assent to Defendant's auto-renewal terms because the only consent-adjacent language on the Checkout Page — "By continuing with your payment, you agree to the future charges listed on this page and the cancellation policy" — was presented in small, light-gray, non-contrasting font below the "Pay now" button, not above it, and did not identify what action would constitute assent to what specific terms. *See supra* ¶ 47. In short, Plaintiff did not expect, want, or consent to Defendant's automatic renewal billing.

61.    After completing her purchase, Defendant sent Plaintiff a confirmation email (the "Acknowledgment Email"). Like the Checkout Page, the Acknowledgment Email's disclosures were misleading, incomplete, and failed to include the required automatic renewal offer terms, a complete cancellation policy, or an adequate mechanism for cancellation capable of being retained by the consumer. Plaintiff did not see or read any adequate ARL disclosure in the Acknowledgment Email, nor could she have been on inquiry notice of those terms because they were either absent, misleading, or not presented clearly and conspicuously.

62.    On October 18, 2025, Plaintiff was surprised to discover a charge of $26.34 from Defendant on her payment account statement. Upon investigating, she realized that she was auto-renewed into Defendant's Kradle Subscription. Plaintiff then attempted to cancel the subscription, but Defendant's Website did not clearly or prominently display a cancellation mechanism. After spending time searching the Website, Plaintiff located a cancellation interface that was not readily accessible. Plaintiff then completed the cancellation steps she found, and believed that she had canceled all of the charges associated with the Kradle Subscription. Plaintiff had no reason to believe

otherwise, because Defendant had never informed her — during checkout or thereafter — that she was enrolled in two separate subscriptions requiring two separate cancellation steps.

63. On November 29, 2025, Plaintiff was again surprised to discover a second unauthorized charge of $26.34 from Defendant on her payment account statement. Upon further investigation, Plaintiff learned for the first time that Defendant had enrolled her in two separate, independently billed subscriptions — one for the "CBD Sleepy CLEANZzz Dental Hard Chew" and one for the second "CBD Skin Recovery Chews"— each operating on a different billing frequency and each requiring a separate cancellation. The cancellation she had completed in October had canceled only the "CBD Skin Recovery Chews" subscription. At no point during the checkout process, in the Acknowledgment Email, or in any other communication, had Defendant explained that her two subscriptions were independent, operated on different schedules, or required separate cancellation steps. Plaintiff was finally able to locate and complete the remaining cancellation before being charged again on December 2025, but only after incurring a second unauthorized charge she had not authorized, expected, or consented to.

64. Had Defendant complied with its ARL obligations — specifically, by presenting the full automatic renewal offer terms clearly and conspicuously, in visual proximity to and before the "Pay now" button, identifying both subscriptions by their individual charge amounts and renewal frequencies, and providing an easy-to-use cancellation mechanism capable of being retained by the consumer — Plaintiff would have been aware of the full scope of recurring charges she was authorizing before completing her purchase. As such, Plaintiff would not have enrolled in either subscription at all, or at a minimum, would have been aware of the separate cancellation steps required for each subscription before she was charged. As a direct result of Defendant's violations of the ARL as alleged herein, Plaintiff suffered economic injury in the form of unauthorized subscription renewal fees. Plaintiff remains interested in Defendant's supplements for her pet, but without knowing the true terms of Defendant's Kradle Subscriptions during the Checkout Page (including the exact recurring charges and deadline to cancel) and without assurance that Defendant's Website will have an ARL-compliant cancellation mechanism, Plaintiff can no longer trust doing so without incurring unwanted charges.

**No Adequate Remedy at Law**

65.    For their equitable relief claims, Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. First, Plaintiff's claims arise from the ARL's provision that subscription goods sent without the consumer's affirmative consent are deemed "unconditional gifts" to the consumer, who "may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business." Cal. Bus. & Prof. Code § 17603. Because Defendant failed to obtain Plaintiff's affirmative consent to the automatic renewal offer terms before charging her payment method, the agreement underlying Defendant's subscription charges is void under the ARL — no valid contract was formed. Where no valid contract exists, there is no breach of contract claim. Accordingly, Plaintiff has no adequate legal remedy for the subscription fees Defendant collected: she cannot sue for breach of a contract that the ARL renders void. The recovery of those fees — which Defendant holds without any valid contractual entitlement — is available only through equitable restitution. This is precisely the circumstance in which courts in this district have permitted equitable claims to proceed alongside legal ones: the legal theory is unavailable, not merely parallel to the equitable theory. Furthermore, even if some breach of contract theory were available to Plaintiff, legal damages and equitable restitution under the UCL and FAL are not co-extensive remedies. Equitable restitution under the UCL and FAL can reach all profits Defendant received as a result of its unlawful practices — including subscription fees paid by all class members across the entire relevant period — measured by Defendant's gains rather than Plaintiff's individual loss. Legal damages, by contrast, are limited to the amount of Plaintiff's own out-of-pocket injury. The UCL's equitable restitutionary remedy, which permits recovery of all monies in which Defendant has no vested interest, is a broader remedy than contract damages and cannot be fully replicated through a legal claim. Plaintiff would be without full compensation if limited to legal remedies alone. In addition, Plaintiff seeks prospective injunctive relief as a matter of public interest — specifically, an order requiring Defendant to comply with the ARL's disclosure and cancellation requirements for all future consumers visiting Defendant's Website. This forward-looking equitable relief protects members of the public who have not yet been harmed, and therefore cannot be replicated through any legal remedy available to Plaintiff individually. Legal relief —

which compensates only for past injury — cannot adequately substitute for an injunction preventing future violations. Finally, the standard for restitution governing Plaintiff's equitable claims differs materially from the damages standard governing her legal claims, such that both may proceed in the alternative at this stage. The Court may award equitable restitution under the UCL and FAL based on proof of Defendant's unjust retention of Plaintiff's subscription fees, even if Plaintiff cannot adduce sufficient evidence to support a full award of contract damages. The availability of one theory of recovery does not foreclose the other where the applicable elements and evidentiary standards differ. Plaintiff is entitled to plead both theories in the alternative at the pleading stage and to develop the factual record through discovery before being required to elect a remedy.

## CLASS ACTION ALLEGATIONS

66. ***Class Definition***. Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as follows (collectively, the "Class"):

> ***ARL Class:*** All persons in the United States who, within the applicable limitation period, up to and including the date of final judgment in this action, were charged a renewal fee for a Kradle Subscription by Defendant.

67. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

68. Specifically excluded from the Class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

69. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

70. ***Numerosity.*** The Class are so numerous that their individual joinder herein is impracticable. On information and belief, the Class comprise at least millions of consumers. The precise number of the members of the Class and their identities are unknown to Plaintiff at this time but may be determined through discovery. The members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

71. ***Commonality and Predominance.*** Common questions of law and fact exist as to all the members of the Class and predominate over questions affecting only individual members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's Kradle Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and the ARL Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the ARL Class members, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

72. ***Typicality.*** The claims of Plaintiff are typical of the claims of the ARL Class in that Plaintiff and the ARL Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the ARL Class members

affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the Kradle Subscriptions before charging their Payment Methods.

73.    *Adequacy*.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no interests antagonistic to the Class' interests, and Plaintiff has retained counsel that has considerable experience and success in prosecuting complex class actions and consumer-protection cases.

74.    *Superiority*.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

75.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

76.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and the Class and will likely retain the benefits of its wrongdoing.

77.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

### COUNT I
**Violations of California's False Advertising Law ("FAL"),
Cal. Bus. & Prof. Code §§ 17500, *et seq*.
(On behalf of Plaintiff and the ARL Class)**

78.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

79.    Plaintiff brings this claim individually and on behalf of the members of the ARL Class against Defendant.

80.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever,

including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

81.    Defendant has violated, and continues to violate, section 17500 of the Business and Professions Code by disseminating untrue and misleading advertisements to Plaintiff and the members of the ARL Class.

82.    As alleged more fully above, Defendant violated, and continues to violate, section 17500 of the FAL through its misrepresentations and omissions made to consumers before and after enrollment into its Kradle Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments.  For instance, Defendant is silent regarding the material terms of its Kradle Subscriptions policies, including Defendant's unilateral rights to change the subscriptions' fees and billing practices, how and when to cancel them, and the consequences of doing so. These misrepresentations and omissions on the Checkout Page and the Acknowledgment Email constitute false and deceptive advertisements.

83.    Defendant's actions in violation of the FAL, as described herein, were false and misleading, such that the general public is and was likely to be deceived.

84.    Plaintiff and the members of the ARL Class did not learn of Defendant's automatic payment policies until after they had already signed up and started paying for Defendant's Kradle Subscriptions.

85.    As such, Plaintiff and the members of the ARL Class saw, read, and reasonably relied on Defendant's statements and omissions to their detriment.

86.    In addition, class-wide reliance can be inferred because Defendant's representations were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to enroll in the Kradle Subscriptions and deciding when to cancel them.

87.    Defendant's representations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the members of the ARL Class.

88.    Plaintiff and the members of the ARL Class suffered economic injury as a direct result of Defendant's conduct because they were induced to purchase Kradle Subscriptions and/or

pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the Kradle Subscriptions, Plaintiff and the members of the ARL Class would not have subscribed to the Kradle Subscriptions, or they would have canceled their Kradle Subscriptions earlier, i.e., prior to the expiration of the initial subscription period.

89.    Plaintiff and the members of the ARL Class seek restitution, attorneys' fees, and all other relief that the Court deems proper.

## COUNT II
### Violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.* (On behalf of Plaintiff and the ARL Class)

90.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

91.    Plaintiff brings this claim individually and on behalf of the members of the ARL Class against Defendant.

92.    Plaintiff and the members of the ARL Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the ARL Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

93.    Defendant's selection and/or subscription offers and the other products pertaining thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b).  The purchases by Plaintiff and the ARL Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

94.    The acts and practices of Defendant as described above were intended to deceive Plaintiff and the ARL Class as described herein, and have resulted, and will result, in damages to Plaintiff and the ARL Class.  These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's representations and omissions about the nature of the Kradle Subscriptions billing, cancellation, automatic payment terms, policies, and requirements conveyed that they have characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

95.     Plaintiff and the members of the ARL Class suffered economic injury as a direct result of Defendant's conduct because they were induced to purchase Kradle Subscriptions and/or pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the Kradle Subscriptions, Plaintiff and the members of the ARL Class would not have subscribed to the Kradle Subscriptions, or they would have canceled their Kradle Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

96.     Plaintiff, on behalf of herself and all other members of the ARL Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

97.     In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant on December 23, 2025, informing Defendant of her intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  Defendant failed to correct its business practices or provide the requested relief within 30 days. As such, Plaintiff and the members of the ARL Class seek monetary damages from Defendant, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA, pursuant to California Civil Code §§1780(a)(1)-(5) and § 1780(e)

## COUNT III
### Violations of California's Unfair Competition Law ("UCL"),
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.
### (On behalf of Plaintiff and the ARL Class)

98.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

99.     Plaintiff brings this claim individually and on behalf of the members of the ARL Class against Defendant.

100.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. &

Prof. Code § 17204. Such a person may bring such an action on behalf of herself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

101. As alleged in detail above, and incorporated herein by reference, Defendant's deceptive enrollment process and false sales of the Kradle Subscriptions violate the UCL's proscription against engaging in **Unlawful Business Practices** through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*; CLRA, Cal. Civ. Code § 1770, *et seq.*; the ARL, Cal. Bus. & Prof. Code § 17602, *et seq.*; and ROSCA, 15 U.S.C. § 8403 ,*et seq.*

102. As alleged in detail above, Defendant violated the ARL and ROSCA by failing to: (a) provide the auto-renewal terms associated with its Kradle Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3). Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Kradle Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

103. Each of these acts and practices constitutes an independent violation of the ARL, ROSCA, the FAL, and CLRA, and thus an independent violation of the UCL.

104. Defendant has also violated the UCL's proscription against engaging **in Unfair Business Practices.** Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, *et seq.* in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

105. There is no public utility to Defendant's illegal automatic renewal practices and. The gravity of the consequences of Defendant's conduct as described above outweigh any justification,

motive, or reason thereof, particularly considering the available legal alternatives for subscriptions in the marketplace. Defendant's illegal auto-renewal and false sales practices only injure healthy competition and harm consumers.

106. Plaintiff and the ARL Class could not have reasonably avoided this injury. Defendant's representations and omissions were deceptive to reasonable consumers like Plaintiff and the ARL Class members.

107. Defendant also violated established public policy by violating the ARL, FAL, CLRA, and ROSCA. The unfairness of these practices is tethered to the legislatively declared policy from each of those statutes.

108. Defendant has also violated the UCL's proscription against engaging **in Deceptive Business Practices.** As alleged in detail above, Defendant committed deceptive acts by enrolling consumers in automatically recurring subscriptions in violation of the FAL, CLRA, ARL and ROSCA.

109. Specifically, Defendant committed deceptive acts by including misleading language and omitting material facts about the auto-renewal features of the Kradle Subscriptions. These representations were false and misleading.

110. Defendant's representations were misleading to Plaintiff and other reasonable consumers.

\* \* \*

111. For all prongs, Defendant's representations were intended to induce reliance, and Plaintiff saw, read, and reasonably relied on them when enrolling in their Kradle Subscriptions. Defendant's representations were a substantial factor in Plaintiff's purchasing decisions.

112. In addition, class-wide reliance can be inferred because Defendant's representations were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to enroll in the Kradle Subscriptions and deciding when to cancel them.

113. Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful

course of conduct. The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the Kradle Subscriptions are still used by Defendant today.

114. Defendant's representations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the members of the ARL Class.

115. Plaintiff and the members of the ARL Class suffered economic injury as a direct result of Defendant's conduct because they were induced to purchase Kradle Subscriptions and/or pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the Kradle Subscriptions, Plaintiff and the members of the ARL Class would not have subscribed to the Kradle Subscriptions, or they would have canceled their Kradle Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

116. Furthermore, Plaintiff and the members of the ARL Class suffered economic injury as a direct result of Defendant's conduct because all products received from Defendant in violation of the ARL constitute "unconditional gifts." *See* Cal. Bus. Prof. Code § 17603. As such, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the ARL Class members in the form of payments made by Plaintiff and the ARL Class members for their Kradle Subscriptions.

117. Pursuant to California Business and Professional Code § 17203, Plaintiff and the ARL Class members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

### COUNT IV
### Negligent Misrepresentation
### (On behalf of Plaintiff and the ARL Class)

118. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

119. Plaintiff brings this claim individually and on behalf of the members of the ARL Class against Defendant under the laws of California.

120. As discussed above, Defendant made false representations and material omissions of fact to Plaintiff and the ARL Class concerning the Kradle Subscriptions' billing, cancellation, automatic payment terms, policies, and requirements.

121.    These representations were false.

122.    When Defendant made these misrepresentations and material omissions of fact, it knew or should have known that they were false or misleading. Defendant had no reasonable grounds for believing that these representations were true or that the material omissions were not misleading when made.

123.    Defendant intended that Plaintiff and ARL Class members rely on these representations and material omissions of fact and Plaintiff reasonably relied on them.

124.    In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to enroll in Defendant's Kradle Subscriptions.

125.    Defendant's misrepresentations and omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the ARL Class members.

126.    Plaintiff and the members of the ARL Class suffered economic injury as a direct and proximate result of Defendant's conduct because they were induced to purchase Kradle Subscriptions and/or pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the Kradle Subscriptions, Plaintiff and the members of the ARL Class would not have subscribed to the Kradle Subscriptions, or they would have canceled their Kradle Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

127.    For the negligent misrepresentation claims, Plaintiff seeks all damages available, including expectation damages, punitive damages, and/or damages measured by the price premium charged to Plaintiff and the ARL Class as a result of Defendant's unlawful conduct.

**COUNT V**
**Intentional Misrepresentation**
**(On behalf of Plaintiff and the ARL Class)**

128.    Plaintiff hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

129.    Plaintiff brings this claim individually and on behalf of the members of the ARL Class against Defendant under the laws of California.

130. As discussed above, Defendant made false representations and material omissions of fact to Plaintiff and the ARL Class concerning the Kradle Subscriptions' billing, cancellation, automatic payment terms, policies, and requirements.

131. These representations and material omissions of fact were false and misleading.

132. When Defendant made these misrepresentations and material omissions of fact, it knew that they were false and misleading at the time they were made and/or Defendant acted recklessly in making the misrepresentations and omissions.

133. Defendant intended that Plaintiff and the members of the ARL Class members rely on these representations and material omissions of fact and Plaintiff reasonably relied on them.

134. In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to enroll in Defendant's Kradle Subscriptions.

135. Defendant's misrepresentations and omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the members of the ARL Class.

136. Plaintiff and the members of the ARL Class suffered economic injury as a direct and proximate result of Defendant's conduct because they were induced to purchase Kradle Subscriptions and/or pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the Kradle Subscriptions, Plaintiff and the members of the ARL Class would not have subscribed to the Kradle Subscriptions, or they would have canceled their Kradle Subscriptions earlier, i.e., prior to the expiration of the initial subscription period.

137. For the intentional misrepresentation claims, Plaintiff seeks all damages available, including expectation damages, punitive damages, and/or damages measured by the price premium charged to Plaintiff and the Class as a result of Defendant's unlawful conduct.

**COUNV VI**
**Unjust Enrichment / Restitution**
**(On behalf of Plaintiff and the ARL Class)**

138.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

139.    Plaintiff brings this claim individually and on behalf of the members of the ARL Class against Defendant under the laws of California, in the alternative.

140.    Plaintiff and the Class conferred benefits on Defendant by purchasing the Kradle Subscriptions.

141.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the ARL Class purchases of the Kradle Subscriptions.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's misrepresentations and material omissions of fact regarding the Kradle Subscriptions, in violation of California and federal laws, induced Plaintiff and the members of the ARL Class to purchase the Kradle Subscriptions under false pretenses.  These material misrepresentations and omissions of fact caused injuries to Plaintiff and the members of the ARL Class because they would not have purchased the Kradle Subscriptions at all, or on the same terms, if the true facts were known.

142.    Due to Defendant's misrepresentations and violation of California and federal laws, its contracts with Plaintiff and the members of the ARL Class are void or voidable.

143.    Plaintiff and the members of the ARL Class seek restitution, and in the alternative, rescission.

144.     For the quasi-contract/unjust enrichment claims, Plaintiff seek all available equitable relief, including injunctive relief, disgorgement, and restitution in the form of a full refund and/or measured by the price premium charged to Plaintiff and the members of the ARL Class as a result of Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   For an order certifying the Class and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.   For an order declaring Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.   For actual, expectation, reliance, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For recission, restitution and all other forms of equitable relief;

g.   For injunctive relief as pleaded or as the Court may deem proper; and

h.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: March 23, 2026.                         Respectfully submitted,


By:   _/s/ Adrian Gucovschi_

Adrian Gucovschi (SBN 360988)
**GUCOVSCHI LAW FIRM, PLLC**
Adrian Gucovschi (SBN 360988)
165 Broadway, 23rd Floor
New York, New York 10006
Telephone: (212) 884-4230
E-Mail: adrian@gucovschilaw.com

**-and-**

**HEDIN LLP**
Frank S. Hedin (SBN 291289)
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107

Facsimile: (305) 200-8801
E-Mail: fhedin@hedinllp.com

*Attorneys for Plaintiff*

FIRST AMENDED CLASS ACTION COMPLAINT

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Adrian Gucovschi, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.

I am a partner at Gucovschi Law Firm, PLLC, counsel of record for Plaintiff Nicole Guidotti in this action.  Plaintiff alleges that she is a citizen of California who resides in Berkeley, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.    The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that Defendant Kradle, LLC regularly does business in the Northern District of California, and a substantial portion of the events alleged in the Complaint, including the same misrepresentations, omissions, and injuries as alleged herein, have occurred in this judicial District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida, on March 23, 2026.

*/s/ Adrian Gucovschi*
Adrian Gucovschi

---

FIRST AMENDED CLASS ACTION COMPLAINT